Herbert A. Posner, J.
Very few New Yorkers are immune from the purchase of insurance. From the "cradle to the grave” we attempt to protect ourselves and our loved ones. In some instances it is mandated by statute. You cannot drive an automobile in New York (and most other States) unless you purchase an auto insurance policy. To the small businessman it is essential — not having fire, liability and other business coverages would spell the "deathknell” for the victim of a casualty. A huge industry — the insurance industry — has been spawned as a result of the tremendous need and demand for multitudinous forms of insurance coverage. In recognition of the tremendous power wielded by the insurer, the State through legislation and regulation, has over the years developed "public policy” for the protection of the insured. When an insurance company applies for and receives a license to do business in this State, it agrees to accept and be bound by the rules and regulations of the State Insurance Department.
In 1970, the State Legislature signaled its recognition of the need to have the insurance company process the insured’s claim fairly and promptly, by enacting section 40-d of the Insurance Law. Section 40-d prohibits insurers doing business in this State from engaging in unfair claims settlement practices. While section 40-d limits enforcement to the State Insurance Department and only for repeated offenses, section *824 273 of the statute defines the commission of any one act under section 40-d as "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance.” Section 272 prohibits any person from engaging in such act or practice. For the purpose of defining minimum standards upon which insurance companies and their employees engaged in claims settlements would be guided, the Superintendent of Insurance issued the following regulation February 1, 1973: "In any case where there is no dispute as to coverage, it shall be the duty of every insurer to offer claimants, or their authorized representatives, amounts which are fair and reasonable as shown by its investigation of the claim”. (11 NYCRR 216.6 [a].)
The courts recognized, to a degree, the power of the insurance company, even before the enactment of section 40-d. In Cappano v Phoenix Assur. Co. of N. Y. (28 AD2d 639, 639-640), the appellate court, drawing upon Federal decisions, stated: "As was stated in Harris v. Standard Acc. & Ins. Co. (191 F. Supp. 538, 540 [Kaufman, J.], cited with approval in Brown v. United States Fid. & Guar. Co. (314 F. 2d 675): 'Since the company, therefore, has power, through the control of settlement, to adversely affect the insured’s interests, it must necessarily bear a legal responsibility for the proper exercise of that power. Thus, the law imposes upon the insurer the obligation of good faith — basically, the duty to consider, in good faith, the insured’s interests as well as its own when making decisions as to settlement. Bad faith — the failure to comply with this obligation — is generally proven by evidence largely circumstantial in nature.’ ”
However, even where the courts find the insurance company acted in "bad faith,” they will not award punitive damages unless there is also proof of malice. (Gordon v Nationwide Mut. Ins. Co., 37 AD2d 265; Walker v Sheldon, 10 NY2d 401; Diamond v Mutual Life Ins. Co. of N. Y, 77 Misc 2d 528; Padavan v Clemente, 43 AD2d 729; Kulak v Nationwide Mut. Ins. Co., 47 AD2d 418.) While the list of actions in which punitive damages have been permitted in this State is long, they generally involve negligence and tort cases. Rarely will the courts award punitive damages in a contract action. Punitive damages are awarded to punish the defendant and protect society against similar acts (Walker v Sheldon, supra; Gostkowski v Roman Catholic Church, 262 NY 320; Sanders v Rolnick, 188 Misc 627).
*825 In the case at hand, the plaintiff did not specifically ask for punitive damages in his complaint, but his bill of particulars contained an element of damage that was not covered by the contract of insurance and at the trial he produced evidence of conduct and alleged malice to support a claim for "extra-contractual” or punitive damages.
The plaintiff is a "closed” corporation that operated a small beauty parlor which suffered a fire loss at 1:00 a.m. on June 2, 1974. Plaintiff submitted a claim, prepared by a public adjuster, to the defendant under its fire insurance policy in the amount of $4,870. Defendant, approximately six months after the fire, offered the plaintiff $1,250. Plaintiff established at the trial that the corporation had limited capital and could not continue in business without the moneys claimed from the insurance company for the fire loss. It was stipulated between the parties that, in fact, the plaintiff was evicted from the premises by the landlord after July 10, 1974.
The defendant, in its answer to this lawsuit filed one year after the fire (June 3, 1975), alleges: "Upon information and belief that the loss alleged to have been sustained by the plaintiff as set forth in its complaint was sustained, if at all, by the deliberate and wilful act of the said plaintiff, its agent, servant and/or employee in that the said fire was wilfully set.” Arson is the willful setting of a fire for the purpose of defrauding the insurer and is a valid reason for defeating the insured’s claim (Hessian Hills Country Club v Home Ins. Co., 262 NY 189; Kirkpatrick v Allemannia Fire Ins. Co., 102 App Div 327, affd 184 NY 546). However, the burden of proof is upon the insurer (Demarest v Westchester Fire Ins. Co., 234 App Div 556, app dsmd 259 NY 627).
While the defendant raised a valid defense in its answer and, thereby, a reasonable explanation for not settling with the plaintiff; it offered not one scintilla of competent evidence. As a matter of fact, it made no effort whatsoever to prove this defense, other than third-rate hearsay. Defendants’ sole witness, its claims adjuster, testified that someone at the New York Board of Fire Underwriters told him that the fire marshal’s report supported arson and he confirmed that fact from his own observations of the premises. He did not, in any way, implicate the plaintiff; though an attempt was made to introduce a letter written by his former employer to the attorneys for the insurance company. The plaintiff’s objection (on hearsay grounds) was upheld, but interestingly plaintiff *826 reopened its case to introduce the letter to prove its contention of malice on the defendants’ part. As far as the amount of the loss, defendants’ expert witness confirmed all of plaintiffs claim except for $1,000 worth of inventory items. Accepting the defendants’ figures and allowing only Vz of the disputed inventory, the court arrives at a loss figure of $4,066 for the fire damages. Since the policy also covered "loss of earnings” and defendant conceded that the premises were unusable for three weeks and that plaintiffs earnings were $435 per month, the plaintiff is also entitled to $326 for "loss of earnings.” Thus, based upon the defendants’ own admissions at trial, the plaintiff is entitled to compensatory damages for breach of contract in the amount of $4,392, over 350% more than the "1,250” defendant offered for the claim six months after the loss.
The court finds from all the evidence that the defendants’ employees acted with malice in "low-balling” plaintiffs claim. They had decided plaintiff was guilty of arson and that they would punish the plaintiff by: (1) forcing it out of business; (2) having to sue and thereby wait years for collection; and (3) making the plaintiff share its award with an attorney. If this court only awards the plaintiff $4,392, which the defendant admits it owed the plaintiff from the very beginning, then the defendant would have accomplished exactly what it set out to do. Maybe the defendant is right and the plaintiff did commit arson, but since when do we base our system of justice upon the principle that "you’re guilty until you prove your innocence”? What a travesty of justice it would be if this court acquiesced to this philosophy by only awarding the plaintiff compensatory damages.
Punitive damages should rarely be awarded in contract actions, and then only if there is an over-riding issue of public policy which it is hoped this punishment will deter the defendant from committing similar acts in the future.
There is yet another reason for assessing punitive damages against the defendant, which has nothing to do with the plaintiffs interests but affects the interests of all those who purchase fire insurance (both business and personal). The court takes judicial notice of the fact that arson fires have doubled in the past 10 years and that such losses are running at an annual rate in excess of $125,000,000. Further, that as a result of this tremendous increase in arson losses, fire insurance premiums have risen dramatically. Defendants’ complete *827 lack of interest in investigating its suspicion of arson is symptomatic of the insurance industry’s abandonment of its public obligation to defeat fraudulent claims in favor of seeking higher premiums from the public. The defendants’ own witness admitted they completely abandoned the defense of arson because the fire marshal’s report "didn’t contain enough evidence.” It is well established that the burden of proof in a civil case is far less than in a criminal case. In a recent press release, the head of the New York State Professional Firefighter’s Association said, "Fire insurance premiums have soared because insurance companies would rather hike rates and have consumers absorb the cost of arson than restore routine investigations of suspicious fires.” (Rap, Insurance Firms on Arson, Long Island Press, Feb. 28,1977, p 3.)
For the compelling reasons of public policy enunciated hereto, this court awards plaintiff punitive damages of $4,392, making a total judgment in the amount of $8,784 with costs, and interest only on compensatory damages from September 1, 1974.